

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-20-00285-CV
_____

ALEXANDRA BOSKE, M.D. AND ST. DAVID'S NEUROLOGY, PLLC,
GAYATRI VELAYUDHAN NAIR, M.D. AND AUSTIN INFECTIOUS
DISEASE CONSULTANTS, P.A., APPELLANTS

V.

KRISTIN ROUGEAU, APPELLEE

On Appeal from the 53rd District Court
Travis County, Texas
Trial Court No. D-1-GN-19-001496; Honorable Tim Sulak, Presiding

July 15, 2021

MEMORANDUM OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

By this accelerated appeal,[1] Appellants, Alexandra Boske, M.D. and St. David's

Neurology, PLLC (hereafter Dr. Boske), Gayatri Velayudan Nair, M.D. and Austin

_____

[1] Originally appealed to the Third Court of Appeals, sitting in Austin, this accelerated appeal was transferred to this court by the Texas Supreme Court pursuant to its docket equalization efforts. TEX. GOV'T CODE ANN. § 73.001 (West 2013). Should a conflict exist between precedent of the Third Court of Appeals and this court on any relevant issue, this appeal will be decided in accordance with the precedent of the transferor court. TEX. R. APP. P. 41.3.

Infectious Disease Consultants, P.A. (hereafter Dr. Nair), appeal from the trial court's order denying their respective motions to dismiss a health care liability suit filed by Appellee, Kristen Rougeau, for injuries sustained when she was treated by both doctors for herpes simplex virus type 2 (HSV-2). By separate briefs, Dr. Boske and Dr. Nair question the adequacy of expert reports from two different doctors, specifically on the issue of proximate cause. They both contend the experts' opinions on causation are conclusory and do not represent a good faith effort to comply with section 74.351(r)(6) of the Texas Civil Practice and Remedies Code. We affirm.

### BACKGROUND

Rougeau, a female in her mid-forties in 2017, has a medical history of attention deficit disorder, scoliosis, and depression. According to the pleadings and expert reports, on March 18, 2017, she was suffering from a severe headache, blurred vision, nausea, and vomiting and sought treatment at First Choice Emergency Department. Her symptoms indicated she was suffering from herpes simplex encephalitis (HSE). HSE is an acute or subacute illness caused by HSV entering the brain matter and causing cerebral dysfunction. HSV is a DNA virus with two strains, HSV-1 and HSV-2. It is a serious, often fatal infection.

While at First Choice Emergency Department, Rougeau had a computed tomography (CT) scan. The results were unremarkable and several attempts to obtain a sample of her cerebrospinal fluid (CSF) failed due to her scoliosis. That same day, she was transferred to St. David's Neurology, PLLC for further treatment.

While at St. David's, Rougeau was treated with intravenous acyclovir beginning March 19. Her CSF was tested with a polymerase chain reaction (PCR) test which

produced a positive result for HSV-2.  A PCR test is used to study DNA in detail.  The findings of the tests were consistent with a viral infection (HSV) in Rougeau's central nervous system.

The abnormal results prompted a consultation on March 20 with Dr. Nair, an infectious disease specialist.  He noted "HSV-2 meningitis confirmed on PCR but no symptoms of encephalopathy."  He recommended intravenous acyclovir treatment for "a planned duration of about a week."

According to progress notes, Rougeau began experiencing jerking movements of her legs and arms and Dr. Boske, a neurologist, was consulted on March 26 to address those concerns.  Dr. Boske noted that the jerking movements began on March 22 and that Rougeau did not have a history of seizures.  A short-term EEG was performed on March 27 and showed a "focal slowing in the 2-6 Hz range is intermittently present over the bitemporal regions, maximal in the left."  Dr. Boske recommended an MRI which was conducted the next day.  The radiologist noted "mild early arteriosclerotic ischemic white matter disease and less likely encephalitis."  Dr. Boske concluded that Rougeau was "neurologically stable" and recommended she be discharged.

Not long after her discharge, Rougeau consulted another neurologist for severe headaches and memory loss.  She sought medical treatment numerous times at different facilities, including at St. David's, between April 2017 and December 2018.  On December 17, 2018, she underwent an assessment with another doctor who concluded Rougeau had mild cognitive impairment primarily impacting attention, executive, and memory abilities.

3

On March 18, 2019, Rougeau filed suit alleging negligence by Dr. Nair, Dr. Boske, and others who are not parties to this interlocutory appeal. Rougeau also alleged that both doctors breached the standard of care in failing to properly treat her which resulted in "life-altering brain damage" in the form of "residual neurologic disease, temporal lobe changes, temporal lobe seizures, and necrosis of her temporal lobes." As to Dr. Nair, Rougeau alleged he failed to properly diagnose, monitor, give appropriate orders, follow the standard of care, and properly discharge her. Although Dr. Boske was consulted to rule out seizures and was not involved in the virus diagnosis, Rougeau alleged, among other failures, that Dr. Boske was negligent in failing to properly diagnose and monitor her condition and prevent her discharge. According to Rougeau, these failures were the direct and proximate cause of permanent injuries.

As required by statute, Rougeau timely served an expert report and curriculum vitae from Dr. Janine Jason, an infectious disease specialist, on the health care providers. Dr. Nair and Dr. Boske filed objections on whether the report constituted an objective good faith effort to satisfy the statutory requirements. The trial court sustained those objections and ruled by letter dated February 28, 2020,[2] that Dr. Jason's report was insufficient. The trial court directed Rougeau to submit an amended report within thirty days. In addition to other deficiencies not relevant to the issue on appeal, the trial court directed Rougeau to address the following deficiencies:

> Proximate cause as it relates to Dr. Nair;
>
> Proximate cause as it relates to Alexandra Boske, M.D. and St. David's Neurology PLLC.

---

[2] The letter ruling was memorialized by formal order on March 12, 2020.

4

On March 7, 2020, Dr. Jason filed a second supplemental report addressing the trial court's concerns on causation.[3]  Regarding Dr. Nair and the causation element of Rougeau's claim, Dr. Jason amended her report to include the following:

> When a patient has active HSV meningitis, the virus is replicating and spreading in the spinal fluid.  When a patient has active HSE, the HSV is replicating and spreading in nerve cells in the brain.  As the virus replicates and spreads, it's destroying more and more brain tissue.  If the patient is immunocompetent, the immune system will eventually overtake the virus and render it dormant.  When HSV is dormant, it causes no further brain damage—but by then significant brain damage often has already occurred. Antiviral medication is given to prevent this damage by stopping replication as quickly as possible.  Acyclovir is a drug designed to rapidly inhibit HSV replication.  In so doing, acyclovir enhances the body's natural immune system, enabling it to place active HSV into dormancy as quickly as possible.  By placing active HSV into dormancy as quickly as possible, the amount of brain tissue destroyed is minimized.  A negative PCR result confirms that the virus is indeed dormant and no further brain damage is occurring.
>
> Dr. Nair gave Ms. Rougeau a maximum of 10 days of acyclovir therapy, not 14 to 21 days.  *To a reasonable degree of medical probability, giving Ms. Rougeau a maximum of 10 days of acyclovir therapy and failing to give Ms. Rougeau 14 to 21 days of acyclovir proximately permitted the HSV to remain active.  To a reasonable degree of medical probability, any HSV that was actively replicating was destroying Ms. Rougeau's brain tissue.  To a reasonable degree of medical probability, the destruction of brain tissue proximately caused Ms. Rougeau to experience a loss of function.*
>
> Dr. Nair's failure to give Ms. Rougeau a PCR test following acyclovir proximately caused him and the other treating physicians to be unable to determine whether the active HSV had become dormant, i.e., whether 10 days of intravenous acyclovir was adequate.  *To a reasonable degree of medical probability, the physicians' lack of awareness regarding whether the HSE had become dormant proximately caused Ms. Rougeau's brain cells to continue to be destroyed by any HSE that remained active because the lack of information prevented additional acyclovir therapy.  To a reasonable degree of medical probability, the failure to provide Ms. Rougeau with continuing (and additional) acyclovir proximately caused any active HSE to remain active.  To a reasonable degree of medical probability, any HSE that remained active replicated and spread, destroying Ms. Rougeau's brain tissue.  To a reasonable degree of medical probability, the*

---

[3] Prior to the March 7, 2020 report, on August 5, 2019, Dr. Jason provided a "supplement" to her original report.  However, the supplement addresses two other doctors not involved in this interlocutory appeal.

*destruction of brain tissue proximately caused Ms. Rougeau to experience a loss of function.*

(Emphasis added).

Regarding Dr. Boske and the causation element of Rougeau's claim, Dr. Jason's supplemental report was identical except that Dr. Boske's name was substituted for Dr. Nair's.

In addition to Dr. Jason's second supplemental report, Rougeau retained another expert, Dr. Maranatha Ayodele, a neurologist, to also file an expert report in support of her claim against Dr. Boske, a fellow neurologist.[4]  Relevant to the causation element, Dr. Ayodele reported as follows:

> HSV infection of the central nervous system (CNS) is the most frequent culprit of sporadic encephalitis in immunocompetent adults.  [Footnote omitted].  HSV is known to have a predilection for causing injury to the temporal lobes of the brain.  As a result of this specific pattern of injury, patients can develop memory dysfunction, confusion, and seizures.  Seizures are an especially frequent occurrence and this is attributed to injury involving the highly epileptogenic limbic structures of the medial temporal lobes.  Ms. Rougeau's clinical course is in fitting with this very common occurrence.
>
> The use of IV acyclovir for the treatment of HSVE has been established as the standard of care since the publication of landmark clinical trials in the 1980s in the Lancet and the New England Journal of Medicine, which demonstrated IV acyclovir greatly reduced the morbidity and mortality associated with HSVE.  [Footnote omitted].  Acyclovir's mechanism of action is via inhibition of HSV-encoded thymidine kinase without affecting human cellular thymidine kinase and thus effectively halts HSV DNA replication without affecting human cellular function.
>
> For the management of HSVE, the standard of care is to treat with IV acyclovir 10 mg/kg every 8 hours for 14 to 21 days.  Further, the early initiation and completion of a full course of treatment is thought to be a key factor in providing the optimal conditions for a favorable outcome.

---

[4] Section 74.351(h) allows for more than one expert report to be filed to satisfy the statutory requirements.  Dr. Ayodele's report was specific only to Dr. Boske's treatment of Rougeau.

To a reasonable degree of medical probability, Dr. Boske's failure to recognize the evidence of cerebral temporal lobe dysfunction found on Ms. Rougeau's EEG and correlate this finding with her known CNS HSV infection led to the failure to establish a diagnosis of HSVE. To a reasonable degree of medical probability, the failure to establish an accurate diagnosis of HSVE led to an inappropriately short course of treatment with IV acyclovir. *To a reasonable degree of medical probability, the inappropriately short course of treatment given to Ms. Rougeau proximately caused ongoing neurologic injury including the development of seizures and focal epilepsy.*

<u>What Dr. Boske should have done and why</u>:

On March 26, 2017, Ms. Rougeau is seen by neurologist Dr. Boske and undergoes an MRI brain and EEG for evaluation of abnormal jerking movements. While the EEG found there was no abnormal brain activity correlated with her jerking movements, it nevertheless found clear evidence of a "focal disturbance of cerebral function" specifically localized to the temporal lobes. This is a key finding that should have altered Ms. Rougeau's diagnosis to HSVE. HSV is well described to have a predilection for causing injury to the temporal lobes and while non-specific in isolation, the presence of focal slowing involving the temporal regions of the brain is a classically described abnormal finding in patients diagnosed with HSVE. To a reasonable degree of medical probability, had Dr. Boske appropriately correlated these findings with Ms. Rougeau's known HSV infection, she would have arrived at a diagnosis of HSVE. To a reasonable degree of medical probability, given a diagnosis of HSVE, Dr. Boske would have ensured Ms. Rougeau received the appropriate course of treatment of IV acyclovir for 14-21 days. *To a reasonable degree of medical probability, had Ms. Rougeau been appropriately treated, she would have either had no neurologic injury at all, or a much less severe course of prolonged neurologic injury.*

(Emphasis added).[5]

The expert reports were met with another round of objections and motions to dismiss. The trial court entered an order denying the objections and the motions to dismiss. Dr. Nair and Dr. Boske filed this interlocutory appeal.

---

[5] Dr. Boske specifically objected to the emphasized portions of the report.

STANDARD OF REVIEW

In reviewing the trial court's decision regarding the adequacy of an expert report under chapter 74 of the Texas Civil Practice and Remedies Code, we apply an abuse of discretion standard. *Abshire v. Christus Health Southeast Tex.*, 563 S.W.3d 219, 223 (Tex. 2018); *Miller v. JSC Lake Highlands Operations*, 536 S.W.3d 510, 512 (Tex. 2017) (per curiam); *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015); *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 44 (Tex. 2013). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). Additionally, in analyzing an expert report, a reviewing court considers only the information within the four corners of the report. *Abshire*, 563 S.W.3d at 223. The report need not marshal all of the plaintiff's proof. *Jelinek*, 328 S.W.3d at 539.

APPLICABLE LAW

A health care liability claim is governed by the Texas Medical Liability Act codified in chapter 74 of the Texas Civil Practice and Remedies Code. Section 74.351(a) of the Act requires any person who brings a health care liability claim to provide an expert report, within 120 days of filing the claim, for each physician or health care provider against whom a claim is asserted. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West 2017). An "expert report" is a "written report by an expert that provides a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal

8

relationship between that failure and the injury, harm, or damages claimed." *See* §
74.351(r)(6); *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013).

To avoid dismissal of a health care liability claim, an expert report must represent an objective good faith effort to comply with the definition of an expert report as specified in section 74.351(r)(6). *See* § 74.351(l). An expert report demonstrates a "good faith effort" when it "(1) informs the defendant of the specific conduct called into question and (2) provides a basis for the trial court to conclude the claims have merit." *Baty v. Futrell*, 543 S.W.3d 689, 693-94 (Tex. 2018). "The expert report requirement is a threshold mechanism to dispose of claims lacking merit[.]" *Potts*, 392 S.W.3d at 631. The trial court need only find that the report constitutes a "good faith effort" to comply with the statutory requirements. *Am. Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001). A report can be informal and does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Potts*, 392 S.W.3d at 631 (citing *Palacios*, 46 S.W.3d at 875).

Notwithstanding the fact that portions of chapter 74 express only "causation" and a "causal relationship" and do not refer to "proximate cause," the Texas Supreme Court has held that an expert report must explain how and why the defendant's breach proximately caused the plaintiff's injury. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). "In satisfying this 'how and why' requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith effort to explain, factually, how proximate cause is going to be proven.'" *Abshire*, 563 S.W.3d at 224 (citing *Zamarripa*, 526 S.W.3d at 460).

9

To satisfy chapter 74 with respect to causation, an expert report "need not use the words 'proximate cause,' 'foreseeability,' or 'cause in fact,'" and its adequacy is not dependent on its use of any magic words. *Zamarripa*, 526 S.W.3d at 460 (citing *Bowie Mem'l Hosp.*, 79 S.W.3d at 53). The expert must "explain the basis of his statements to link his conclusions to the facts." *See Jelinek*, 328 S.W.3d at 539. *See also Zamarripa v. Columbia Valley Health Care Sys., L.P.*, No. 13-18-00231-CV, 2019 Tex. App. LEXIS 1485, at *7 (Tex. App.—Corpus Christi Feb. 28, 2019, pet. denied) (mem. op.). Additionally, the "trial court may read several reports in concert in determining whether a plaintiff has made a good-faith effort to comply with the Act's requirements." *Miller*, 536 S.W.3d at 513.

### ANALYSIS

By their respective issues, Dr. Boske and Dr. Nair both challenge the proximate cause element of Rougeau's expert reports.[6] They contend the experts' opinions are not supported by factual statements and are conclusory. We disagree and find that the expert reports constitute a good faith effort to explain the "how and why" the alleged negligence caused Rougeau's injury.

### THE HOW?

The expert reports demonstrate that tests and procedures performed on Rougeau at the time she was admitted to St. David's showed she had active HSV in her central nervous system. HSV that is not dormant replicates and spreads in the spinal fluid and destroys brain tissue. The expert reports detail the recommended treatment at the time

---

[6] In their objections to the expert reports, both doctors challenged the experts' qualifications; however, on appeal, their challenges are limited to the causation element of Rougeau's claim.

of Rougeau's hospitalization—administration of intravenous acyclovir for a period of fourteen to twenty-one days.

Acyclovir is an antiviral drug that is converted to acyclovir triphosphate and inhibits virus replication. It does not, however, cure the virus or heal damage caused by the virus. Acyclovir triphosphate potently inhibits HSV DNA polymerase, a viral enzyme required for viral replication. Dr. Jason noted that acyclovir treatment has been the standard of care since the 1980s. Following the recommended time for acyclovir therapy of fourteen to twenty-one days, the standard of care is to repeat a PCR test on CSF. She also noted that a PCR test on CSF "has been the reference standard for early diagnosis of HSE since the early 1990s." If the test is positive, acyclovir should be continued until a subsequent PCR test is negative. A negative test shows the virus has become dormant which minimizes the amount of brain tissue destroyed.

Rougeau did not receive intravenous acyclovir for the recommended time frame. Dr. Nair discharged her on March 28 after only nine days of acyclovir treatment. Also, the discharge notes do not indicate that Rougeau was given a subsequent PCR test when the acyclovir treatment was discontinued to determine if the virus had become dormant or whether to continue the acyclovir treatment if the virus remained active. The discharge notes reflected that Rougeau was instructed to consult her primary care doctor in two days and return to the emergency department if her headache worsened or if she experienced neck pain.

Regarding Dr. Boske, she performed an EEG and an MRI on Rougeau to determine the cause of jerking movements in her arms and legs. Dr. Boske was aware that Rougeau's medical history did not include seizures. Despite the test results, she

discharged Rougeau. According to Dr. Ayodele's report, Dr. Boske failed to recognize evidence of cerebral temporal lobe dysfunction found on Rougeau's EEG and correlate that with Rougeau's diagnosis of HSV infection.

Dr. Nair's and Dr. Boske's failures constituted a breach of the standard of care for treating Rougeau's condition. That breach resulted in loss of cognitive function and seizures.

### THE WHY?

The expert reports show that Rougeau's worsened condition resulted from a breach of the standard of care. Dr. Nair's failure to administer the recommended treatment of acyclovir made him unable to determine whether the virus in Rougeau's central nervous system had become dormant. Instead, the shortened treatment allowed the virus to remain active and cause further destruction of her brain tissue which resulted in a loss of function.

According to Dr. Ayodele's report on Dr. Boske's breach of the standard of care, she failed to properly alter Rougeau's diagnosis after clear evidence of a "focal disturbance of cerebral function" following the EEG and MRI test results. Her failure to correlate the test results with Rougeau's virus infection prevented the appropriate course of acyclovir treatment of fourteen to twenty-one days. The expert reports represent a good faith effort that had Rougeau been properly diagnosed and treated, her neurologic injury would have been much less severe. The reports did not need to present every fact nor all the evidence required to prove the case at trial. They merely needed to notify the doctors of the conduct called into question and provide a basis for the trial court to

12

conclude that Rougeau's claim has merit. The expert reports provide a link of how and why the breach resulted in Rougeau's injury.

In *Abshire*, 563 S.W.3d at 224, the Supreme Court concluded that an excerpt from an expert report provided a "straightforward link" on causation as follows:

> [t]he lack of properly assessing Ms. Abshire's medical history and physical conditions is a breach in the standard of care. Lack of information results in a delay in proper medical care and is an impediment for the managing doctor to be able to order appropriate testing and prescribe proper treatment and preventative care.

Here, the four corners of the expert reports similarly detail a failure to properly diagnose Rougeau and a failure to properly administer acyclovir treatment for the recommended time period, followed by a subsequent PCR test. The doctors' conduct resulted in a failure to contain the virus which continued to destroy Rougeau's brain tissue. We conclude the expert reports submitted by Rougeau demonstrate a good faith effort on the causation element of her health care liability claim and are not merely conclusory. Deferring to the trial court's sound discretion, we find no abuse in the decision to deny the motions to dismiss Rougeau's suit.

### CONCLUSION

The trial court's order denying Dr. Boske's and Dr. Nair's respective motions to dismiss is affirmed.

Patrick A. Pirtle
Justice

13